# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

EUGENE BROWN,

     Plaintiff,

v.

                           Case No. 01-71683
                           Hon. Gerald E. Rosen

CITY OF DETROIT, BENNY
NAPOLEON, WALTER SHOULDERS,
and DETROIT BOARD OF POLICE
COMMISSIONERS,            **CLOSED**

     Defendants.

_____/

## OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION TO DISMISS

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____2 3 APR 2003_____

PRESENT:  Honorable Gerald E. Rosen
                United States District Judge

## I. INTRODUCTION

Plaintiff Eugene Brown, a police officer for the Defendant City of Detroit,

commenced this suit in this Court on April 30, 2001, alleging that he was denied a

promotion, transferred from street to desk duties, and subjected to public criticism by the

Defendant City, two of its high-ranking police officials — Defendant Benny Napoleon,

the former chief of police, and Defendant Walter Shoulders, a deputy police chief — and

the Defendant Detroit Board of Police Commissioners.  Plaintiff alleges that Defendants

35

took these actions in an effort to set him up as a scapegoat or example, in order to deflect

media criticism that the Detroit police department was not taking sufficient steps against

officers who had used deadly force.  Based on these allegations, Plaintiff asserts a variety

of claims under 42 U.S.C. § 1983, contending that Defendants violated his rights under

the First, Fifth, and Fourteenth Amendments to the U.S. Constitution.[1]

By motion filed on October 19, 2001, Defendants seek the dismissal of these

federal constitutional claims.  Principally, Defendants maintain that Plaintiff has failed to

identify a fundamental right or property or liberty interest that could sustain his

substantive or procedural due process claims.  Plaintiff filed a response in opposition to

this motion on November 20, 2001, and Defendants filed a reply brief in further support

of their motion on December 3, 2001.

On February 20, 2003, the Court addressed Defendants' motion at a conference

with counsel.[2]  Having reviewed the parties' briefs and the record, and having considered

the statements of counsel at the February 20 conference, the Court now is prepared to rule

on this motion.  This Opinion and Order sets forth the Court's rulings.

---

[1]Plaintiff apparently has also initiated a state-court suit against these same Defendants, asserting defamation and other claims under Michigan law.

[2]Between the filing of Defendants' motion and this recent conference, the parties reached a tentative settlement, but were unable to secure the approval of the Detroit City Council.  Thus, by Order dated July 16, 2002, the Court granted the parties an additional period of discovery, and set a deadline of October 31, 2002 for the filing of any further dispositive motions.  No such motions were filed, leaving only Defendants' initial motion still to be resolved.

## II. FACTUAL BACKGROUND

According to the Complaint, Plaintiff Eugene Brown has been employed as a police officer for the Defendant City of Detroit since May 24, 1993. During his tenure, he has received various awards and accolades, including the Walter Scott Distinguished Service Award. Plaintiff also has been involved in several shooting incidents during this period; in particular, he has shot nine individuals, killing three and wounding six others.

Each of the three fatal shootings was investigated through a three-tiered process employed by the Defendant City. Specifically, these incidents were investigated by the police department's internal affairs division, a department board of review, and the Wayne County prosecutor's office. In each instance, Plaintiff was cleared of any wrongdoing, and the shootings were deemed legally justified.

In 1998, Plaintiff took and passed an examination required for promotion to sergeant. In accordance with the collective bargaining agreement governing Detroit police officers, Plaintiff's name was placed on a list of officers eligible for promotion. Before Plaintiff could be promoted, however, both of Detroit's major newspapers ran articles about the use of deadly force by Detroit police officers. On May 14, 2000, the Detroit News published an article captioned "Detroit is Soft on Killer Cops," in which Plaintiff was identified as a Detroit police officer who had killed three people and wounded six others, and the Detroit police department was criticized as conducting investigations which were "often inadequate and geared toward clearing [officers] of

3

wrongdoing." Similarly, the Detroit Free Press published an article on May 15, 2000 entitled "Detroit Cops are the Deadliest in the U.S."

Plaintiff alleges that Defendants reacted to this media criticism by taking several actions against him. First, Defendant Benny Napoleon, Detroit's chief of police at the time, convened an executive board of review to re-examine Plaintiff's actions in four past shooting incidents, including the three fatal shootings previously investigated by the police department and the prosecutor's office. This three-member board was chaired by Defendant Walter Shoulders, a deputy police chief. Plaintiff alleges that this additional round of scrutiny of an officer's use of deadly force was unprecedented in the department.

At the conclusion of its review, the executive board issued its findings in an October 12, 2000 report, referred to throughout this litigation as the "Shoulders Report." Since it was issued, this report has been kept in strictest confidence — although Defendant Napoleon and defense counsel have reviewed it, neither the Detroit City Council nor the Defendant Detroit Board of Police Commissioners has been given access to this document, and Defendants generally have taken the position that this report is protected by the deliberative process privilege. Following an *in camera* review, however, the Court ruled in a May 17, 2002 Order that Plaintiff's counsel would be permitted to inspect the Shoulders Report and certain related materials, under conditions which would ensure that these documents were not disclosed or used beyond the four corners of this litigation. The Court discusses the Shoulders Report in greater detail below; it suffices to

4

observe, for the moment, that as to *each* of the four shooting incidents re-examined in the report, the executive board determined that Plaintiff's actions were unjustified. As noted earlier, these conclusions are directly at odds with those reached following the initial, contemporaneous reviews of Plaintiff's actions in the three fatal shooting incidents.[3]

In any event, before the executive board had concluded its review and issued its October 12, 2000 report, former Chief Napoleon cited this ongoing investigation as a basis for recommending that Plaintiff not be promoted, despite his performance on the sergeant's exam. Specifically, on August 3, 2000, Napoleon wrote to the Defendant Detroit Board of Police Commissioners, stating:

> As you are aware, I have forwarded to the Board a request that the Board approve thirty-eight promotions to the rank of Sergeant. Police Officer Eugene Brown is not listed in the names of candidates for promotion. He is currently seventh on the eligibility register. Section 7-1114 of the Detroit City Charter provides:
>
> > The chief of police shall make all promotions within the department. All promotions shall be with the approval of the board.
> >
> > Promotions shall be made on the basis of competitive examinations . . . . No person who has taken an examination and has been placed on a register of employees eligible for promotion, may be passed over in favor of an employee with a lower examination score, unless the chief of police files with the board and the division of police personnel written reasons for the bypass, and the [bypass] is approved by four (4) of the commission members serving. Any person having been passed over may appeal to the board.

---

[3] As to the fourth, non-fatal shooting incident, it appears that the initial investigation had not yet concluded as of the date that the executive board began to look into the matter.

5

This letter will serve as written reasons for not promoting Police Officer Eugene Brown.

Several months ago certain information was brought to my attention concerning the involvement of Police Officer Brown in a number of fatal and non-fatal shooting incidents. After giving careful consideration to the matter, I determined that the matters should receive further review by an executive board chaired by Deputy Chief Walter Shoulders . . . . These executives have conducted an exhaustive review of these incidents to determine whether any [officer] engaged in conduct in violation of applicable department policy or state or federal law.

At this point in time, the investigative process is not complete, although I anticipate a final report being available in the near future. In light of that fact, and so as to not prematurely disclose investigative details, it would not be appropriate to disclose the investigative findings. However, the circumstances presented by the pending promotions require that I inform the Board that the investigative process has disclosed information that was not considered in the earlier investigations that ha[s] required a referral to the Wayne County Prosecutors Office for a determination of whether that office will issue a criminal warrant. Based upon these facts, I do not believe that it would be consistent with the best interests of the Department or the public to promote Officer Brown to the rank of Sergeant at this time. Therefore, based upon the discovery of substantial information and the pending decision by the Wayne County Prosecutors Office on the issuance of a criminal warrant, I have not submitted Officer Brown's name for promotional consideration at this time. However, it should be added that it would be my intention to do so at the conclusion of the investigation if no warrant is issued and the investigation exonerates the officer from wrongdoing.

(Defendants' Motion, Ex. C.) Nonetheless, in light of the "uncommon procedural posture" of the matter, Napoleon recommended that Plaintiff's pay be increased to the higher sergeant's rate, pending the completion of the executive board's investigation or further action by the police chief or the Board of Commissioners. (Id.)

In keeping with Napoleon's recommendation, the Board of Commissioners

6

declined to approve Plaintiff's promotion.[4]  Indeed, Plaintiff alleges that the Board had already determined, even prior to receiving Napoleon's August 3, 2000 correspondence, that Plaintiff would not be promoted.  According to the Complaint, members of the Board "acknowledged privately" in early July of 2000 that they would not approve Plaintiff's promotion.  (Complaint at ¶ 44.)  Plaintiff asserts, in contrast, that ten other police officers had been promoted to sergeant in 1998 and 1999, despite having recently been disciplined or having disciplinary charges pending against them.

Plaintiff further alleges that Police Chief Napoleon and other police officials embarked upon a public campaign to tarnish his reputation and call into question his competence as a police officer.  Plaintiff maintains, for instance, that Napoleon prepared his August 3, 2000 letter with full awareness that it would be discussed at a public meeting of the Board of Police Commissioners which would be attended by the local media.  Plaintiff's Complaint also quotes from newspaper reports reflecting that portions of the work product of the executive board of review had been leaked to the media.  A story in the September 20, 2000 edition of the Detroit Free Press, for example, stated that "[a]n investigation concluded that none of[] the four shootings occurred the way Brown said they did."  (Id. at ¶ 34(i).)

---

[4]Defendants assert that the Board also accepted Napoleon's recommendation to pay Plaintiff at the higher sergeant's rate.  Defendants further state that Napoleon, upon reviewing the complete investigative record, recommended in May of 2001 that Plaintiff be promoted, but that the Board elected not to follow this recommendation.  None of these assertions is supported by record evidence, however.

More specifically, several newspaper articles published during the summer of 2000 reported direct comments from Napoleon and other police officials regarding Plaintiff's involvement in various shooting incidents. A Detroit Free Press article dated July 13, 2000, for instance, quoted Napoleon as stating that "new evidence" had been uncovered about these incidents which "could help prosecutors decide whether a criminal warrant will be sought," and quoted unnamed police officials as opining that Plaintiff "could face a manslaughter charge" in one of the incidents and "departmental discipline" in the others. (Id. at ¶ 34(c).) Napoleon was quoted in another newspaper report as stating that "new evidence" had led him to "question the validity of some fatal police shootings that were ruled justified," and that he had "serious concerns about how the department had dealt with Eugene Brown from the moment he was an applicant in the department." (Id. at ¶ 34(e).) Similarly, Napoleon allegedly stated in a television interview that Plaintiff "was not qualified to be a police officer." (Id. at ¶ 34(g).)

Finally, apart from the decision to convene an executive board of review, the denial of a promotion, and the series of allegedly false public statements by Detroit police officials about his job performance, Plaintiff alleges that he was "summarily transferred from street duties to inside duties," based upon "impermissible reasons and in violation of the Collective Bargaining Agreement." (Id. at ¶ 29.) Plaintiff asserts that each of these actions violated his rights under the U.S. Constitution, and he appeals to the theories of substantive and procedural due process, equal protection, and protection against "coerced

political activity as a requirement of one's employment as secured by the First and Fourteenth Amendments." (Id. at ¶ 59.)

## III. ANALYSIS

### A. The Standards Governing Defendants' Motion

Defendants have moved for the dismissal of the claims against them under Fed. R. Civ. P. 12(c). When considering a defendant's motion under this Rule for judgment on the pleadings, the Court must accept the complaint's factual allegations as true, and must construe the complaint in a light most favorable to the plaintiff. Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999). However, the Court "need not accept as true legal conclusions or unwarranted factual inferences." Mixon, 193 F.3d at 400. Defendants' motion may be granted only if Plaintiff "undoubtedly can prove no set of facts in support of [his] claims that would entitle [him to] relief." 193 F.3d at 400 (internal quotations and citation omitted).

### B. Plaintiff Has Failed to Identify a Fundamental Right or Constitutionally Protected Property or Liberty Interest That Could Support His Due Process Claims.

Although Plaintiff has appealed to several constitutional provisions in this case, it is apparent from his Complaint, as well as his response to Defendants' motion, that he intends primarily to pursue substantive and procedural due process claims.[5] Under the

---

[5] Indeed, Plaintiff's response brief mentions no other theories, and fails to take issue with Defendants' contention in their motion that Plaintiff's allegations cannot sustain viable claims under either the First Amendment or the Equal Protection Clause of the Fourteenth Amendment.

first of these theories, Plaintiff must allege and show that Defendants interfered with a

"fundamental" right or liberty interest that is accorded special constitutional protection.

See Washington v. Glucksberg, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 2267 (1997).[6]

Similarly, under a procedural due process theory, Plaintiff must allege and demonstrate,

as an initial matter, that Defendants interfered with a constitutionally protected liberty or

property interest. See Joelson v. United States, 86 F.3d 1413, 1420 (6th Cir. 1996). In

their present motion, Defendants contend that Plaintiff has failed as a threshold matter to

identify any fundamental right or liberty or property interest that could sustain a

constitutional due process claim, whether substantive or procedural. The Court agrees.

Upon reviewing Plaintiff's Complaint and his response to Defendants' motion, the

Court is able to discern three potential candidates for a constitutionally protected interest.

First, Plaintiff asserts that he had a constitutionally protected interest in promotion to

sergeant, having taken all of the necessary steps to qualify for this promotion. Next,

Plaintiff suggests that he might have possessed such an interest in his "street duties" as a

police officer, such that Defendants ran afoul of the Due Process Clause by placing him

in a desk job. Finally, Plaintiff submits that he had a constitutionally protected interest in

his good name and reputation, which Defendants allegedly infringed by publicly

questioning his fitness to be a police officer. The Court will address each of these

---

[6]Substantive due process also has been held to protect against governmental abuses of power that "shock the conscience." See County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 1716-17 (1998). Plaintiff's Complaint, however, does not allege any such "conscience shocking" conduct by Defendants.

putative interests in turn.

### 1.    Defendants' Failure to Promote Plaintiff

Regarding Plaintiff's asserted right to a promotion, Defendants quite correctly point out that this claim is largely foreclosed by the Sixth Circuit's ruling in <u>Charles v. Baesler</u>, 910 F.2d 1349 (6th Cir. 1990).  In that case, plaintiff Franklin Thomas Charles was a fire department captain whose performance on a promotion examination placed him fifth in line for promotion to major.  This promotion list expired after two years, but municipal authorities failed to prepare a new list as required under the governing ordinance.  Charles eventually reached the top of the expired list, but the department refused to promote him, explaining that the list had expired and that, in any event, the position to which he would have been promoted was scheduled to be abolished in the near future.  Charles brought suit under 42 U.S.C. § 1983, alleging, among other theories, that the defendant government officials and municipality had violated his right to substantive due process by failing to promote him.

The District Court granted summary judgment to Charles on this claim, but the Sixth Circuit reversed, holding that Charles had no substantive due process right to a promotion:

> We conclude that no such right exists.  Most, if not all, state-created contract rights, while assuredly protected by procedural due process, are not protected by substantive due process.  The substantive Due Process Clause is not concerned with the garden variety issues of common law contract.  Its concerns are far narrower, but at the same time, far more important.  Substantive due process affords only those protections so rooted in the

11

traditions and conscience of our people as to be ranked as fundamental.  It
protects those interests, some yet to be enumerated, implicit in the concept
of ordered liberty . . . .

State-created rights such as Charles' contractual right to promotion
do not rise to the level of "fundamental" interests protected by substantive
due process.  Routine state-created contractual rights are not deeply rooted
in this Nation's history and tradition, and, although important, are not so
vital that neither liberty nor justice would exist if [they] were sacrificed.

In the present case, we do not believe liberty and justice are
threatened, in the constitutional sense, by the failure of the government and
its officials to abide by their contract with Charles.  Governments breach
contracts virtually every day without dire consequences ensuing to the
human dignity or basic autonomy of the promisees . . . .  [W]e are satisfied
that in the usual breach of contract case such as this, failure to meet
contractual obligations cannot be equated with the sort of injustice inherent
in egregious abuse of government power.  Similarly, any claim that Charles'
right to promotion . . . is deeply rooted in our national history and tradition
is both legally and historically indefensible.

Charles, 910 F.2d at 1353 (internal quotations and citations omitted); see also Paskvan v.

City of Cleveland Civil Service Comm'n, 946 F.2d 1233, 1236 (6th Cir. 1991) (holding

that "there is no substantive due process right involved in [the plaintiff police officer's]

claim of failure to carry out a purported understanding about promotion procedures").  In

light of Charles, no substantive due process claim arises here as a result of Defendants'

failure to promote Plaintiff.

Nor does Plaintiff fare any better under a procedural due process theory of

recovery.  There is, to be sure, some limited authority for the proposition that a

contractual entitlement to a promotion might rise to the level of a property interest

protected by the Due Process Clause.  See Paskvan, 946 F.2d at 1236-37; see also Ramsey

12

v. Board of Education of Whitley County, 844 F.2d 1268, 1271-72 (6th Cir. 1988) (stating that the unilateral elimination of most of the plaintiff employee's accumulated sick leave "could have" implicated a constitutionally protected property interest). Defendants assert without contradiction, however, that Plaintiff's pay was increased to the sergeant rate, even though he was not promoted to that position. As noted by Defendants, the Sixth Circuit has explained that a suspension with pay "avoid[s] due process problems entirely." Jackson v. City of Columbus, 194 F.3d 737, 749 (6th Cir. 1999 (citing Cleveland Board of Education v. Loudermill, 470 U.S. 532, 544-45, 105 S. Ct. 1487, 1495 (1985)). It follows that due process protections are not triggered by a failure to promote, so long as the employee nevertheless is granted the increase in pay that normally would accompany such a promotion.

In any event, even if Plaintiff could establish a property interest in a promotion, the Court then would be compelled to consider "what process is due" before Defendants could deprive him of this interest. See Jackson, 194 F.3d at 749; Ramsey, 844 F.2d at 1272.[7] Plaintiff has failed to plead, as he must, that "the state's post-deprivation remedies for redressing the wrong are inadequate." Jackson, 194 F.3d at 750. Nor does it appear that Plaintiff could make such an allegation, where the collective bargaining agreement

---

[7]As noted by Defendants, no case law addresses the sort of process which might be due to someone who is denied a promotion, presumably because no court has squarely held that such a denial implicates a constitutionally protected liberty or property interest.

governing his employment includes grievance and arbitration mechanisms.[8]  See, e.g., Chaney v. Suburban Bus Division of Regional Transp. Authority, 52 F.3d 623, 630 (7th Cir. 1995) ("[G]rievance and arbitration procedures can (and typically do) satisfy the requirements of post-deprivation due process.").  Indeed, Defendants state without contradiction that Plaintiff actually has invoked this grievance procedure to challenge the failure to promote him.[9]  Moreover, even in the absence of such a contractual mechanism, Plaintiff still would have an adequate opportunity to challenge the denial of a promotion through a state-law breach of contract action.  See Ramsey, 844 F.2d at 1274.  Consequently, the Court finds that Plaintiff has failed to state a due process claim arising from Defendants' failure to promote him.

## 2.    The Alleged Alteration of Plaintiff's Job Duties

In his response to Defendants' motion, Plaintiff seemingly recognizes that the denial of a promotion alone likely is insufficient to sustain his due process claims.  He suggests, however, that this denial should be viewed in combination with his transfer

---

[8]The Court notes that it has been made aware of these mechanisms through Defendants' submission of a portion of the collective bargaining agreement as an exhibit to their motion. Although resort to this exhibit ordinarily would dictate that Defendants' motion be resolved under the summary judgment standards of Fed. R. Civ. P. 56, the Sixth Circuit has stated that "[d]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." Jackson, 194 F.3d at 745.  In this case, the Complaint alleges that Plaintiff's right to a promotion arose in part from the terms of the collective bargaining agreement.  (See Complaint at ¶ 39(c).)  Thus, the Court believes it appropriate to treat this agreement as part of the pleadings.

[9]The Court understands that Plaintiff prevailed in this grievance process, but that he still has yet to be promoted.  It appears that this has spawned still more state court litigation.

14

from street to inside duties, and that the totality of Defendants' conduct in this regard was tantamount to a constructive demotion or even a constructive discharge. Once again, the Court finds that the case law forecloses the theory of recovery advanced by Plaintiff.

Indeed, this conclusion is compelled by the very same authorities cited above. Charles holds, after all, that "substantive due process does not protect [a] run-of-the-mill contractually-based property interest," Charles, 910 F.2d at 1351 — in that case, an asserted interest in a promotion. In this case, even if Plaintiff's claimed right to a promotion is viewed in combination with the alleged diminution in his job responsibilities, the ruling in Charles would still control — Plaintiff would merely be appealing to *two* "run-of-the-mill" contractual entitlements rather than one. As cautioned in Charles, "the Constitution must not be trivialized by being dragged into every personnel dispute in state and local government." Charles, 910 F.2d at 1355-56 (internal quotations and citation omitted).

Likewise, the decision in Jackson continues to foreclose Plaintiff's procedural due process claim, even with the additional allegation that the denial of a promotion was accompanied by a reduction in his duties. Again, Jackson found that an outright suspension with pay did not raise any due process concerns. It follows that the lesser form of infringement in this case, an alleged reassignment to a desk job, cannot sustain a procedural due process claim. Moreover, the Court again notes that state remedies were available to redress any allegedly improper alteration of the terms or conditions of

15

Plaintiff's employment.

To be sure, if some combination of Defendants' actions could be construed as tantamount to a constructive discharge, the above-cited authorities arguably would cease to control, and this case instead might be governed by the decisions concerning *termination* of public employees. The courts have recognized, for example, that public employees have a constitutionally protected property interest in continued employment, so that they must be afforded a hearing or some opportunity to respond prior to their outright discharge. See Loudermill, 470 U.S. at 542, 105 S. Ct. at 1493. Likewise, the Sixth Circuit has expressly distinguished between "a property interest in a pure benefit of employment" and "an interest in the tenured nature of employment itself," with only the latter giving rise to a § 1983 suit. Ramsey, 844 F.2d at 1274-75. This distinction is unavailing to Plaintiff, however, for the simple reason that he has not been discharged, either actually or constructively — to the contrary, he remains employed as a Detroit police officer, apparently at a sergeant's rate of pay. A mere impact upon the terms and conditions of Plaintiff's employment, without more, does not suffice to establish a constitutional due process violation.

### 3.    The Alleged Damage to Plaintiff's Reputation

Finally, Plaintiff argues that his due process claim may proceed on the basis of injury to his reputation, good name, and integrity as a police officer, as a result of Defendants' public statements of their reasons for not promoting him. The Sixth Circuit

has repeatedly recognized a constitutionally protected liberty interest in a person's "reputation, good name, honor, and integrity." See, e.g., Jackson, 194 F.3d at 751; Ludwig v. Board of Trustees of Ferris State Univ., 123 F.3d 404, 409-10 (6th Cir. 1997); Joelson, 86 F.3d at 1420; Chilingirian v. Boris, 882 F.2d 200, 205 (6th Cir. 1989). Thus, if a government employer makes a public disclosure that stigmatizes an employee, the employee must be afforded an "opportunity to clear his name," or a so-called "name-clearing hearing." Chilingirian, 882 F.2d at 205 (internal quotations and citations omitted). "To establish a deprivation of a protected liberty interest in the employment context, a plaintiff must demonstrate stigmatizing governmental action which so negatively affects his or her reputation that it effectively forecloses the opportunity to practice a chosen profession." Joelson, 86 F.3d at 1420.

The Court readily concludes that Plaintiff has sufficiently alleged "stigmatizing governmental action," in the form of repeated public statements by Detroit police officials indicating, for example, that Plaintiff might face criminal prosecution for his role in certain fatal shooting incidents, that further investigation had cast doubt upon Plaintiff's version of the events surrounding these incidents, and that Plaintiff was not qualified to be a police officer. Nonetheless, the Sixth Circuit has emphasized that injury to reputation alone does not suffice to trigger the right to a name-clearing hearing. See Ludwig, 123 F.3d at 410. Rather, as noted, the negative effect must be such as to "effectively foreclose[] the opportunity to practice a chosen profession." Joelson, 86 F.3d

17

at 1420.  Indeed, the Sixth Circuit has gone further, adopting a five-element test for

determining whether governmental statements implicate the liberty interest in reputation.

See Ludwig, 123 F.3d at 410.  Under the first element of this inquiry, "the stigmatizing

statements must be made in conjunction with the plaintiff's termination from

employment."  Ludwig, 123 F.3d at 410.

Once again, then, Plaintiff's due process claim fails by virtue of his continued

employment as a Detroit police officer.  Defendants' allegedly defamatory statements

were not made in conjunction with Plaintiff's discharge, but instead related to the

decision to deny him a promotion despite his eligibility for the rank of sergeant.  More

generally, it cannot be said that Defendants' statements precluded Plaintiff from

practicing his chosen profession, because he remains employed as a police officer, albeit

not under the circumstances that he would prefer.  Under the controlling precedents, the

outcome of this case is clear — Plaintiff's allegations do not suffice to state a due process

claim under 42 U.S.C. § 1983, whether of the substantive or procedural variety.[10]

---

[10]As noted earlier, Defendants' motion also challenges Plaintiff's First Amendment and
equal protection claims, on the ground that the Complaint contains no allegations that might
support these theories of recovery.  In particular, Plaintiff does not allege that he engaged in any
activity protected by the First Amendment, nor does he identify the "coerced political activity"
alluded to in the Complaint as giving rise to his First Amendment claim.  Regarding Plaintiff's
appeal to equal protection, he has not alleged that Defendants took any action against him
because of his membership in a protected class.

More generally, in order to state a claim under 42 U.S.C. § 1983, Plaintiff must identify a
deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the
United States.  See Mercure v. Van Buren Township, 81 F. Supp.2d 814, 820 (E.D. Mich. 2000).
The Court already has held that Plaintiff has not identified a constitutionally protected interest

### 4.   Concluding Observations

Before leaving this matter, the Court feels compelled to express its concern with Defendants' conduct as alleged by Plaintiff. First, the Court is troubled by the close temporal proximity between the media reports questioning the efficacy of the Detroit police department's deadly force investigations and Defendants' decision to revisit the shooting incidents involving Plaintiff. Plaintiff already had been cleared of wrongdoing in each of these incidents, yet Detroit's police chief convened a special review board to revisit Plaintiff's conduct on these occasions, some of which dated back several years. Then, rather than handling this matter confidentially, Defendants or other police officials apparently leaked information to the media that tended to portray Plaintiff in a bad light, suggesting that he had improperly employed deadly force on more than one occasion and faced possible criminal charges. All of this certainly would permit the inference that Plaintiff was used as a scapegoat to shield more senior police officials from public scrutiny and criticism of their handling of deadly force incidents.

This concern is further fueled by the end product of the executive review board, the so-called "Shoulders Report." The Court has reviewed this report *in camera,* and has

---

that was abridged through Defendants' actions. In addition, the Court notes that Plaintiff made no effort in his response to Defendants' motion to shore up his First Amendment or equal protection claims. Accordingly, the Court finds that these claims are subject to dismissal.

Finally, the Court notes that the individual Defendants have appealed to qualified immunity, and that the Defendant City has argued that there is no basis for municipal liability. Again, in light of the Court's conclusion that Plaintiff has not stated a viable claim against any Defendant under § 1983, the Court need not address these alternative grounds for dismissal.

acceded to Defendants' request that it remain confidential, subject to only limited inspection by Plaintiff's counsel. Nevertheless, without divulging the specific contents of this report, the Court observes that it appears entirely consistent with Plaintiff's underlying theory of Defendants' worst motives in this case — namely, that Defendants capitulated to media attention and community pressure surrounding the use of deadly force by Detroit police officers, and that Plaintiff was publicly held up as a scapegoat to deflect this undesired scrutiny. Most notably, the executive board reviewed essentially the same record developed during the initial inquiries into Plaintiff's three fatal shootings, yet the board's conclusion in *each case* was diametrically opposed to the findings in the initial review process. Though Plaintiff's actions previously had withstood three levels of scrutiny and he had been cleared of any wrongdoing, the executive board nonetheless found in each instance that Plaintiff had fired his weapon without justification. Further, under a fair reading of the Shoulders Report, the executive board was able to reach its markedly different conclusions only by going out of its way to construe the record in a light that tended to inculpate Plaintiff. Indeed, the Court is not alone in this view of the Shoulders Report — much the same observations were made by two high-ranking Detroit police officials who were asked to assess the executive board's findings.[11]

Given the nature of the Shoulders Report, the Court is disturbed by Defendants' appeal to the deliberative process privilege as a means to prevent its disclosure.

---

[11]These two evaluations were encompassed in the Court's *in camera* review, and Plaintiff's counsel was permitted to inspect them along with the underlying Shoulders Report.

According to Plaintiff's complaint, and as corroborated by contemporaneous news reports, Defendants seemingly engaged in self-serving leaks of select portions of the executive board's work product, while sharply limiting access to the full substance of the board's report. The public was told only that Plaintiff's conduct appeared questionable and that criminal warrants might issue, without any opportunity to assess the specific processes and findings through which the executive board reached its conclusions. This is hardly a compelling set of circumstances upon which to rest a claim of privilege. To the contrary, it is precisely under such conditions that privileges are deemed to be waived. See, e.g., In re Columbia/HCA Healthcare Corp. Billing Practices Litigation, 293 F.3d 289, 307 (6th Cir. 2002) (observing that a claim of privilege ordinarily should not be permitted to operate "as a sword rather than a shield"); In re Sealed Case, 121 F.3d 729, 738 (D.C. Cir. 1997) (explaining that appeals to the deliberative process privilege are routinely denied "where there is reason to believe that the documents sought may shed light on government misconduct"); United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) (cautioning that a privilege may not be invoked "to disclose some selected communications for self-serving purposes," and that it "may implicitly be waived when [a party] asserts a claim that in fairness requires examination of protected communications").

Unfortunately for Plaintiff, all of this is not enough to sustain his constitutional claims, absent a more material impact upon his job as a Detroit police officer. "Put

simply, not every social injustice has a judicial remedy," and "[t]he federal judiciary is not a good-government watchdog." Nunez v. City of Los Angeles, 147 F.3d 867, 874 (9th Cir. 1998). As is clear from the foregoing survey of the governing case law, motive does not enter into the inquiry unless Plaintiff first can identify a deprivation of a constitutionally protected right or interest. Though Defendants' motives in this case appear to be questionable at best, Plaintiff's allegations cannot support a federal constitutional theory of recovery. Plaintiff must look to state law or the union grievance process for any redress of his injuries.

There is an undeniable irony in this result. Defendants' presumed basis for denying Plaintiff a promotion is their concern that he has been involved in an inordinate number of shootings, some of them fatal, and several of which have been judged harshly in Defendants' most recent review of the incidents. Indeed, former Police Chief Napoleon allegedly went even further, purportedly suggesting in an interview that Plaintiff was not qualified to be a police officer. Yet, Plaintiff nevertheless *remains* a Detroit police officer, and thereby retains his obligation to carry a weapon at all times. If Defendants now took steps to terminate his employment, Plaintiff likely would respond by commencing a new suit, this time supported by an adverse action sufficient to sustain his federal constitutional claims.

Defendants, in short, have ensured themselves the worst of both worlds. They have given Plaintiff a desk job for life, on pain of further litigation in which their

successful defense in this case is no longer available.  At the same time, they have failed

to achieve their presumed objective of taking more effective and decisive action against

Detroit police officers who improperly employ deadly force.  Indeed, if Plaintiff's

allegations are true, and Defendants acted out of a self-serving desire to deflect media

criticism and create a more positive public perception of the City of Detroit's response to

police shootings, even this more dubious objective has not been achieved, as it surely will

be (and already has been) reported that Plaintiff remains on the job despite Defendants'

public questioning of his job performance.  All of this presumably is to *neither* side's

liking, nor is it likely that Detroit taxpayers are pleased with these developments.

Although it is beyond this Court's power to resolve this dilemma, the Court urges the

parties to consider their dispute in this light as they determine how to proceed from here.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' October 19,

2001 Motion to Dismiss is GRANTED.


Gerald E. Rosen
United States District Judge

23